**Peter C. COLE,**

v.

**The UNITED STATES.**

**No. 259–81C.**

United States Claims Court.

July 31, 1986.

Geoffrey A. FitzGerald, Temple, Tex., for plaintiff.

Alvin A. Schall, with whom were Asst. Atty. Gen. Richard K. Willard, David M. Cohen, and Sandra P. Spooner, Washington, D.C., for defendant; Captain Chester Paul Beach, Jr., Office of The Judge Advocate Gen., Dept. of Army, of counsel.

## OPINION

WHITE, Senior Judge.

In this military pay case, the plaintiff, Peter C. Cole, a former officer in the Regular Army, complains that he was wrongfully separated from the Regular Army. The plaintiff seeks restoration to active duty in the Regular Army, and reimbursement for the pay, allowances, and other benefits that he would have received if he had continued to serve on active duty in the Regular Army after the date of his separation.

### Discussion

The really crucial facts in this case, reduced to their essence, can be summarized in a single paragraph, as follows:

On June 15, 1976, Captain Cole, while in a state of emotional turmoil over what he regarded as unfair treatment by his battal-

ion commander, submitted to the battalion commander his unqualified resignation as a captain in the Regular Army. By July 26, 1976, however, the plaintiff had changed his mind, and had decided that he did not wish to resign from the Army. On that same day, the plaintiff orally informed the commanding general of the division to which his battalion was attached that he (Captain Cole) wished to withdraw his resignation. Captain Cole's desire to withdraw his resignation was confirmed in writing by means of a communication which he submitted to the division commander on July 27, 1976. It continued to be Captain Cole's desire, at all relevant times after July 26, 1976, to withdraw his resignation and not to resign from the Army. However, officers in the chain of command above Captain Cole successively refused to permit him to withdraw his resignation. On March 10, 1977, Captain Cole was separated from the Regular Army, when the Army accepted the resignation which Captain Cole had endeavored unsuccessfully for more than 7 months to withdraw.

The four successive refusals to permit Captain Cole to withdraw his resignation were based largely upon the views of the officers involved in the several refusals that, all factors considered, Captain Cole's performance of duty had not been satisfactory.

The plaintiff's performance was considered as of the time when he was serving as S-4 of the 2nd Battalion of the 50th Infantry (the 2/50th), 2nd Armored Division. As Battalion S-4, Captain Cole was responsible for the supply and maintenance of equipment, and for accounting for all battalion property. The 2/50th was regularly stationed at Fort Hood, Texas, but, during part of the time involved in this case, it was temporarily deployed to Germany with other battalions from the 2nd Armored Division for the purpose of engaging in a training exercise. While in Germany, the 2/50th and the other battalions from the 2nd Armored Division constituted the 3rd Brigade of the 2nd Armored Division, and the 3rd Brigade was attached to the 1st Armored Division for operational purposes.

In the performance of his duties as Battalion S-4, Captain Cole was highly competent from the technical standpoint, being very knowledgeable, extremely hard-working, very zealous and conscientious, and motivated by a high sense of duty. During his tenure as S-4 of the 2/50th, Captain Cole greatly improved the battalion's situation as regards the supply and maintenance of equipment and accountability for property. It was generally considered that, from the standpoint of ability, Captain Cole had the potential for a brilliant career in the Army.

On the other hand, Captain Cole's manner of dealing with battalion personnel militated against his being able to maintain cooperative relationships with other officers and the enlisted personnel of the 2/50th. Captain Cole was very intolerant of views that differed from his own; he was prompt to criticize others; and he was inclined to use harsh and abusive language in speaking to, or about, anyone with whom he disagreed. For example, there were occasions when, in staff meetings with the battalion commander and the company commanders in the 2/50th, company commanders would make factual statements with which Captain Cole disagreed, and Captain Cole would openly charge the particular officers with lying. Captain Cole's abrasive personality caused dissension and bad feelings in the battalion.

As the plaintiff, at all times on and after July 26, 1976, did not wish to resign from the Regular Army, and as all the Army officials involved in the processing of the plaintiff's case on and after July 26, 1976, were aware that the plaintiff did not wish to resign from the Army, one cannot escape the conclusion that, in reality, the plaintiff was separated involuntarily from the Regular Army.

As a matter of first impression and from the standpoint of fundamental fairness, it would seem that, since the plaintiff's resignation was submitted voluntarily, and not in lieu of facing an adverse proceeding looking toward his being separated involuntarily from the Regular Army for unsatis-

factory performance of duty, it should have been the plaintiff's prerogative to withdraw the resignation at any time before its acceptance. Then, if any of the superior officers in the chain of command regarded the plaintiff's performance of duty as being sufficiently unsatisfactory to warrant his being separated involuntarily from the service, the proper proceeding to effect such involuntary separation could have been instituted under 10 U.S.C. §§ 3781–87 (1976). This would have required advance notice to Captain Cole, a formal hearing before a Board of Inquiry, with Captain Cole being afforded a full opportunity to defend himself, and, in the event of a decision by the Board of Inquiry adverse to Captain Cole, a review of the case by a Board of Review.

However, this is not a matter of first impression. In 1981, when the present case was pending before this court's predecessor, the United States Court of Claims, the defendant filed a motion for summary judgment. Captain Cole's response in opposition to the motion contended that "resignations are nullities until their effective date," and that Captain Cole's "involuntary separation without due process procedures is void." The Court of Claims did not grant the defendant's 1981 motion for summary judgment. However, the Court of Claims, in holding that it was legally permissible for the Army to process Captain Cole's case under Army Regulation 635–120, necessarily rejected Captain Cole's contentions. *See Cole v. United States,* 231 Ct. Cl. 702, 705, 689 F.2d 1040, 1042 (1982).

■ The decision of the Court of Claims in the *Cole* case is binding on this court. See General Order No. 1 (1 Cl.Ct. XXI).

Army Regulation 635–120 deals with the subject of "Officer Resignations and Discharges." Section 2–4 of Chapter 2 of AR 635–120 provides in part as follows:

2–4. Withdrawal of Resignation. *a.* An officer may request withdrawal of his resignation * * * at any time prior to commencing travel pursuant to orders issued for the purpose of separating him. The request, stating reasons therefor, will be forwarded through channels. Each forwarding endorsement will include recommendation for approval or disapproval. Reasons for disapproval will be stated.

*b.* A resignation or request for discharge may be withdrawn only with the approval of Headquarters, Department of the Army, except that—

1. An unqualified resignation * * * may be withdrawn upon the approval of an endorsing commander in the field and the resignation returned to the officer concerned if the resignation has not been forwarded by the Command.

The provision from AR 635–120 quoted in the preceding paragraph plainly contemplates that each endorsing commander in the plaintiff's case who considered both the plaintiff's resignation and his request for withdrawal (Colonel Watts, General Webb, and General Patton) had the discretionary authority either to permit the plaintiff to withdraw his application or to deny the request for withdrawal and send the papers forward to the next higher officer in the chain of command. Similarly, the regulation vested in the Headquarters, Department of the Army, the authority either to grant or deny the plaintiff's request to withdraw his resignation.

The validity of section 2–4, with its grant of discretionary authority to endorsing officers and to the Headquarters, Department of the Army, over requests to withdraw resignations was expressly upheld by the Court of Claims as being applicable to Captain Cole's case. The Court of Claims' decision is binding on this court.

The Court of Claims said, however, that there remained in the case a triable issue of fact as to whether the Army officials, in refusing to permit the plaintiff to withdraw his resignation, were retaliating against the plaintiff for the past exercise of his First Amendment right to freedom of speech, or to prevent such exercise in the future (231 Ct.Cl. at 705, 689 F.2d at 1042).

Captain Cole, while his resignation and his request to withdraw the resignation

were pending before the Army, went over the heads of his superior officers at the battalion, brigade, and division levels, and distributed very widely—to the Inspector General of the U.S. Army in Europe, to the Inspector General of the U.S. Army, to the Commanding General of the VII Corps, to the Commanding General of the U.S. Army in Europe, and to Members of Congress—numerous communications concerning incidents of alleged mismanagement in the 3rd Brigade of the 2nd Armored Division.

Captain Cole's communications to Members of Congress prompted at least some of them to write letters of inquiry to the Department of Defense; and his communications to the Inspectors General resulted in a number of investigations being conducted.

The evidence in the record, however, fails to prove that the plaintiff's actions in making such accusations to higher authorities in the Army and to Members of Congress had any influence on the decisions of the endorsing officers, or on the decision of the Headquarters, Department of the Army, to deny the plaintiff's request to withdraw his letter of resignation. Rather, it appears from the evidence in the record that the persons who refused to permit the plaintiff to withdraw his resignation were mainly concerned with: (1) Captain Cole's reputation as a person who dealt harshly with his peers and subordinates, thereby causing dissension and bad feelings in the battalion; and (2) the intemperate and bitter language about the Army which Captain Cole used in his letter of resignation.

The major issue in the case—*i.e.*, whether it was permissible for the Army to separate Captain Cole from the Regular Army against his will by accepting a resignation which he had submitted voluntarily, but which he had later endeavored for more than 7 months to withdraw, and without granting him the protection of the due process procedures that were necessary in separating involuntarily officers for unsatisfactory performance of duty—was answered by the Court of Claims adversely to Captain Cole's position. The decision of the Court of Claims on that point is binding on the Claims Court.

 As a result, the Claims Court was left with a relatively minor issue to decide—*i.e.*, whether Captain Cole was separated from the Regular Army in retaliation for his exercise of his First Amendment right to freedom of speech, or to prevent such exercise in the future. The evidence in the record would not support a finding to that effect.

### Conclusion of Law

On the basis of the findings of fact and the past history of the case, the court concludes as a matter of law that the plaintiff is not entitled to recover.

The clerk will therefore dismiss the complaint.

No costs.

IT IS SO ORDERED.

### Findings of Fact

The court makes the following findings of fact.

1. The plaintiff was commissioned a Second Lieutenant in the Regular Army of the United States on June 9, 1971, upon his graduation from the United States Military Academy at West Point.

2. The plaintiff was promoted to the rank of Captain in June of 1975; and on August 26, 1975, he was assigned as the Battalion S–4, or Supply Officer, for the 2nd Battalion of the 50th Infantry (the 2/50th), 1st Brigade, 2nd Armored Division, at Fort Hood, Texas. Captain Cole continued to serve as S–4 of the 2/50th until mid-June of 1976. As Battalion S–4, Captain Cole was responsible for the supply and maintenance of equipment, and for accounting for all battalion property.

3. In the performance of his duties as Battalion S–4, Captain Cole was highly competent from the technical standpoint, being very knowledgeable, extremely hardworking, very zealous and conscientious, and motivated by a high sense of duty. During his tenure as S–4 of the 2/50th, Cap-

tain Cole greatly improved the battalion's situation as regards the supply and maintenance of equipment and accountability for property. It was generally considered that, from the standpoint of ability, Captain Cole had the potential for a brilliant career in the Army.

4. Captain Cole's manner of dealing with battalion personnel militated against his being able to maintain cooperative relationships with other officers and enlisted personnel in the 2/50th. Captain Cole was very intolerant of views that differed from his own. He was prompt to criticize others; and he was inclined to use harsh and abusive language in speaking to, or about, anyone with when he disagreed. For example, there were occasions when, in staff meeting with the battalion commander and the company commanders in the battalion, company commanders would make factual statements with which Captain Cole disagreed, and Captain Cole would openly charge the particular officers with lying.

5. On April 15, 1976, the 2/50th, including Captain Cole, and other battalions from the 2nd Armored Division, were deployed to Germany as part of a "Brigade 75" exercise (*i.e.*, an exercise in which Army units from the United States were temporarily deployed overseas for a training exercise and temporarily attached to divisions regularly stationed overseas). The battalions from the 2nd Armored Division in Germany were organized as the 3rd Brigade, and the 3rd Brigade was attached to the 1st Armored Division for operational purposes. The 1st Armored Division was commanded by Major General William Webb. The units of the 3rd Brigade, including the 2/50th, still remained under the control of the 2nd Armored Division at Fort Hood for administrative and personnel purposes.

6. In Germany, as at Fort Hood, the Battalion Commander of the 2/50th was Lt. Col. Raymond F.R. Tomlinson and the Battalion Executive Officer was Major James L. Haygood; the 3rd Brigade, to which the 2/50th was assigned, was commanded by Colonel William Coad; and the 1st Armored Division, which had operational control over the 3rd Brigade, was commanded by Major General William Webb.

7. While in Germany, the 2/50th was located at Hohenfels, the Commander of the 3d Brigade was located at Garfenwoehr, and the Commanding General of the 2d Armored Division was located at Anspach.

8. Shortly after the arrival of the 2/50th in Germany, the plaintiff, serving in his position as Battalion S-4, discovered problems in the area of combat readiness and logistical and financial management. The plaintiff reported to the proper authorities instances of missing supplies in his battalion and in the 3rd Brigade. On May 11, 1976, the plaintiff was appointed to be an investigating officer under AR 15-6 to investigate "the facts and circumstances surrounding the lack of accountability for Class III and Class IV supplies belonging to the 498th Support Battalion", and to "[e]stablish primary liability as required." The plaintiff held this assignment in addition to his regular duties, and proceeded to perform the investigatory duties required by the assignment.

9. In Germany, Captain Cole continued to perform his assigned duties in a technically superior manner. On the other hand, his harsh judgment of others and his abrasive attitude toward others, caused dissension and bad feelings among his fellow officers in the 2/50th. Lt. Col. Tomlinson, Commander of the 2/50th, finally concluded that, although Captain Cole was technically very competent in the supply area, he was a disruptive force and was damaging morale in the battalion.

10. (a) On June 14, 1976, Lt. Col. Tomlinson telephoned Colonel Coad, the Brigade Commander, and informed Colonel Coad that he (Lt. Col. Tomlinson) needed to move Captain Cole out of the 2/50th, because of the problems Captain Cole was causing in the battalion. Colonel Coad replied that he would consider the matter.

(b) After talking with Lt. Col. Tomlinson, and then considering the question of what should be done about Captain Cole, Colonel Coad decided that Captain Cole should be returned to Fort Hood as soon as possible.

At about 10:00 p.m. on June 14, 1976, Colonel Coad telephoned Lt. Col. Tomlinson and agreed that Captain Cole would be moved out of the 2/50th.

11. After his second telephone conversation with Colonel Coad on June 14, 1976, Lt. Col. Tomlinson went to Captain Cole's room and informed him that he would no longer be serving in the position of Battalion S-4, because he had become a disruptive force in the 2/50th; and that he would receive another duty assignment.

12. Captain Cole was outraged by what he regarded as the action of Lt. Col. Tomlinson in relieving him for cause from the position of Battalion S-4.

13. On the morning of June 15, 1976, Captain Cole, while in a state of emotional turmoil, went to Lt. Col. Tomlinson's office and submitted his unqualified resignation from the Army. The letter of resignation stated in part as follows:

1. I, Peter C. Cole, Captain, Infantry, * * * hereby tender my unqualified resignation from the Army under the provisions of Chapter 3 AR 635–120, to become effective 7 January 1977 or as soon as practicable thereafter.

2. I desire to tender my resignation because I am convinced that the principles of duty, honor, and country are no longer a part of the U.S. Army. In the few years that I have had the opportunity to serve as an Army officer, I have observed in the Army a rapid deterioration in the quality of leadership provided by the officers and the quality of soldiers allowed to serve in the U.S. Army. With the advent of the volunteer Army, quality has been replaced by quantity which has reduced the U.S. Army to the lowest levels of American society. The U.S. Army does not represent the wide spectrum of American society it once did under the draft. It is very safe to say that today the soldiers entering the Army are largely uneducated and, for the most part, are the failures of society. The senior Defense officials who have been boasting of the success of the volunteer Army have been outright lying when it comes to the education levels of the soldiers in the Army and the daily performance of these same soldiers. * * The resources allocated by Congress in men and equipment to the U.S. Army are wasted and lost so much that a complete Congressional investigation is fully warranted into what the U.S. Army really does during duty hours with its men and equipment. The amount of unsatisfactory training and losses of equipment reported are appalling. Perhaps the most disturbing aspect of the U.S. Army to me is the lack of integrity in the Officer Corps. My faith and trust in my fellow officers has ebbed to such a low point because it is a rarity to find an officer who has the moral courage to tell the truth. Loyalty has simply replaced integrity. I have personally witnessed superiors reward subordinates with outstanding special officer efficiency reports for their ability to lie. Integrity in the entire Army chain of command is nonexistent. * * *

14. When Captain Cole submitted his resignation to Lt. Col. Tomlinson, Captain Cole was still furious over the events of the previous evening. Lt. Col. Tomlinson told Captain Cole that he should not make an important decision while he was angry, and that he should reconsider his resignation. Captain Cole replied that he had considered the matter for some time and that he had decided he wanted to resign.

15. On June 16, 1976, Lt. Col. Tomlinson endorsed Captain Cole's resignation forward, and recommended that he receive an honorable discharge.

16. In order that Captain Cole might have a temporary assignment pending future developments, he was attached to the Headquarters of the 498th Support Battalion for duty.

17. On or about June 17, 1976, Captain Cole met with Colonel Coad, the Brigade Commander. As Captain Cole was very emotional, Colonel Coad advised Captain Cole to take the resignation and carefully reconsider it. Captain Cole replied that he

wanted the resignation to go higher up the chain of command.

18. (a) On or about June 21, 1976, Captain Cole submitted to Colonel Coad a written request for an explanation regarding what Captain Cole termed his "relief as the Battalion S–4." Colonel Coad asked Lt. Col. Tomlinson to respond to the request.

(b) Lt. Col. Tomlinson's initial response to Captain Cole's request was regarded by both Captain Cole and Colonel Coad as too general. Colonel Coad then requested that Lt. Col. Tomlinson provide a more specific response.

(c) Lt. Col. Tomlinson's second response to Captain Cole's request was dated July 11, 1976. It outlined numerous incidents in which Captain Cole, reportedly in the presence of others, had used harsh, profane, or vulgar language in criticizing various officers and enlisted men of the 2/50th, and which had caused Lt. Col. Tomlinson to conclude that Captain Cole was a disruptive influence and was creating dissension in the 2/50th. Colonel Coad regarded the memorandum of July 11, 1976 as an adequate response to Captain Cole's request.

19. (a) On July 7, 1976, Captain Cole went to see General Webb, the Commanding General of the 1st Armored Division, and submitted to General Webb a letter dated July 6, 1976. The letter stated in part as follows:

2. I request that a full investigation be conducted that I be given a written explanation with regard to the precise reason and the exact circumstances with names, dates, times and locations that led to my relief as the Battalion S–4.

3. If I do not receive a written explanation within a reasonable length of time, I will utilize the chain of command, the office of the Inspector General and my Congressional representatives to obtain assistance in this matter.

(b) Subsequently, Captain Cole presented to General Webb the memorandum of July 11, 1976, which Lt. Col. Tomlinson had prepared as an explanation of the reasons why Captain Cole had been transferred from the position of Battalion S–4 in the 2/50th.

General Webb believed that the memorandum of July 11, 1976, was not specific enough, and he directed Colonel Coad to inquire further into the matter.

20. (a) Upon receiving General Webb's order, Colonel Coad directed that Major Thomas Turk conduct an AR 15–6 investigation into the circumstances "surrounding and leading up to removal of CPT Cole from 2/50 as Battalion S–4, and his attachment to HQC, 498th Support Battalion for duty."

(b) General Webb, upon learning that Colonel Coad had ordered an AR 15–6 investigation, with its possible implication of misconduct or insubordination, decided to terminate the investigation.

21. (a) In lieu of the investigation, General Webb directed Brigadier General Clyde Spence, Assistant Division Commander, 1st Armored Division, to conduct an informal inquiry and determine the facts and circumstances surrounding Captain Cole's change of duty assignment, and to inquire into Captain Cole's allegation that he had been "relieved."

(b) General Webb instructed Colonel Coad to hold Captain Cole's letter of resignation until General Spence completed his inquiry.

(c) During the course of his inquiry, General Spence interviewed Major Turk, Colonel Coad, Captain Cole (in the presence of his Army attorney, Captain Randall Pretzer, who had been appointed to assist Captain Cole), Lt. Col. Tomlinson, the Executive Officer of the 2/50th, the Sergeant Major of the 2/50th, two or three Company Commanders in the 2/50th, the S–3 in the 2/50th, and many other military personnel.

22. On July 14, 1976, Captain Cole wrote to Lt. Gen. Kroesen, Commander of the VII Corps in Germany, and to General Blanchard, Commander of the U.S. Army in Europe, disclosing information indicating financial, logistical, and readiness mismanagement among units of the 3rd Brigade of the 2nd Armored Division.

23. On July 15, 1976, Captain Cole submitted to the Inspector General of the United States Army Europe 25 allegations of alleged mismanagement in the 3d Brigade of the 2nd Armored Division.

24. (a) Pursuant to General Webb's instructions, General Spence wrote a memorandum to Captain Cole under the date of July 17, 1976. This memorandum stated in part as follows:

(1) You have been made aware by both the brigade and battalion commanders as to their reasons for change in duty assignments.

(2) The cause was in no way based on the technical competence of your job performance. To the contrary, I am persuaded that you were an excellent battalion S-4, who improved the battalion's posture in that area.

(3) The cause of your change in duty assignment was the abrasiveness of your personality, which militated against good interpersonal relationships with your superior, those who worked for you, and those battalion personnel whom you served as a principal staff officer. In short, the battalion commander determined that the change was necessary in that you were disruptive to the battalion in your S-4 capacity.

(b) General Spence, in his memorandum of July 17, 1976, requested that Captain Cole inform him (among other things) as to whether Captain Cole wanted the resignation letter of June 15, 1976, to be forwarded. With respect to this inquiry, Captain Cole stated as follows in a letter dated July 19, 1976:

3. I request that my letter of resignation dated 15 June 1976 be held at the 3rd Brigade, 2d Armored Division, until a full investigation into my relief has been completed by the chain of command and the USAREUR Base.

(c) In the course of his inquiry, General Spence requested Lt. Col. Tomlinson to prepare a memorandum setting forth specific instances of the behavior on the part of Captain Cole which were known personally to Lt. Col. Tomlinson and which led to Lt.

Col. Tomlinson's determination that Captain Cole should no longer serve as Battalion S-4 and should be transferred out of the 2/50th. Lt. Col. Tomlinson responded to this request by writing a memorandum dated July 22, 1976.

25. General Spence, Captain Cole, and Captain Pretzer met again on July 25, 1976. At this meeting, General Spence furnished Captain Cole with a copy of Lt. Colonel Tomlinson's memorandum dated July 22, 1976.

26. (a) By means of a memorandum dated July 26, 1976, General Spence furnished to General Webb a report on the informal inquiry that he had conducted. The memorandum contained the following findings:

a. That LTC Tomlinson, CO, 2/50th Inf, did on 14 June 1976 reassign CPT Cole; he did not relieve him for cause.

b. That CPT Cole perceived his reassignment as a relief for cause brought about by his persistence in correcting serious deficiencies in the supply system.

c. That LTC Tomlinson terminated the assignment of CPT Cole because the latter had lost the support of the battalion officers and enlisted men and had had a disruptive influence throughout the battalion.

d. That there were sufficient causes, when considered collectively, or in some cases, singly, to justify assignment termination or even relief for cause of CPT Cole by the battalion commander.

e. That CPT Cole has received an adequate explanation about the reasons for his assignment termination.

(b) The memorandum also contained a "Summary of observations," which included the following:

b. After examining available documentation and conducting numerous interviews with CPT Cole's superiors, peers and subordinates, I have become convinced that the battalion commander was correct in terminating the assignment of CPT Cole as S-4 in the 2/50th. CPT Cole is an extremely hardworking,

knowledgeable and technically competent S-4, undoubtedly the best in the 3/2 AD; however, his lack of sensitivity to human relations and his inability to work effectively with people have caused him to manifest a highly disruptive influence throughout the battalion—this fact is attested to by his peers, subordinates and commanders. CPT Cole is a perfectionist who cannot tolerate mistakes by others; he is highly critical of all who fail to perceive problems as he perceives them. He consistently has shown a lack of loyalty to his unit and chain of command, a lack of respect for the dignity of the individual, and a failure to recognize the meaning of morale, esprit and compassion. He has on numerous occasions used harsh, abusive and profane language in criticizing others. In fact, many of the incidents involving CPT Cole would, in my judgment, have justified the "relief for cause" of CPT Cole.

27. (a) On July 26, 1976, a meeting was held in the office of Major General Webb, Commanding General of the 1st Armored Division, to discuss Captain Cole's case. Those present at the meeting were Major General Webb, Brigadier General Spence, Lt. Col. Tomlinson, Captain Cole, and Captain Pretzer, legal counsel for Captain Cole. At the outset of the meeting, General Webb emphasized that no consideration had ever been given to disciplinary action against Captain Cole. There followed considerable discussion of Captain Cole's reassignment from the position of Battalion S-4 in the 2/50th, which General Webb summarized by stating that the battalion commander had lost confidence in Captain Cole's ability to operate as a team member.

(b) With respect to Captain Cole's letter of resignation, General Webb stated that it would be forwarded by the 3rd Brigade, through him (General Webb) for appropriate action by the Commanding General of the 2nd Armored Division. Captain Cole spoke up and stated that he wished to withdraw the resignation. General Webb responded that Captain Cole should provide him with a clear, crisp letter of withdrawal, with a good rationale for wanting to withdraw the letter of resignation.

28. By means of a letter dated July 27, 1976, Captain Cole requested the withdrawal of his resignation. The letter stated as follows:

I request that my Unqualified Resignation dated 15 June 1976 be withdrawn and all copies of this resignation be returned to me.

In recent weeks, I have noted a marked interest and concern from members of this chain of command with regard to my case. No doubt my resignation was submitted during a period of time when I felt that I had been unfairly treated. My limited perception of the situation created a belief in my mind that my efforts to rectify the situation were to be of no avail. However, I am now convinced that the sincere efforts by members of the chain of command are in my best interest.

29. As of July 28, 1976, Colonel Ronald L. Watts had been the Commanding Officer of the 3rd Brigade, 2nd Armored Division, for 5 days, having succeeded Lt. Col. Tomlinson in that position on July 23, 1976. On July 28, 1976, Colonel Watts met with Captain Cole to discuss the latter's resignation and his request that the letter of resignation be withdrawn. In view of the bitter tone of the letter of resignation, Colonel Watts concluded that Captain Cole should not be permitted to withdraw the letter of resignation. Accordingly, on July 28, 1976, Colonel Watts endorsed the letter of resignation and sent it forward, with a recommendation that the letter of resignation be approved. In recommending approval of the letter of resignation, Colonel Watts stated as follows:

I have only known CPT Cole since 23 July 1976, when I assumed command; however, I have discussed this resignation with him. My impression is that CPT Cole is an intelligent officer and could make a contribution to the US Army; however, his current attitude toward the Department of the Army is clearly stated in his letter of resignation.

Based on this attitude, I recommend his resignation be accepted by the Department of the Army.

30. Captain Cole's letter of resignation, his request to withdraw the resignation, and the endorsements of Lt. Col. Tomlinson and Colonel Watts next went to Major General Webb. After considering the matter, General Webb decided on August 2, 1976, to disapprove Captain Cole's request to withdraw the resignation, and to recommend approval of the resignation. In explaining at the trial his reason for disapproving Captain Cole's request to withdraw the letter of resignation, General Webb emphasized that the request to withdraw the letter of resignation did not address any of the matters set forth in the letter of resignation, did not provide a convincing rationale for Captain Cole's desire to withdraw the letter of resignation, and did not indicate a desire on the part of Captain Cole to stay in the Army. It was General Webb's evaluation of Captain Cole that he was technically competent, but that his manner of dealing with people limited his potential as an officer.

31. After adding his endorsement to Captain Cole's letter of resignation, General Webb sent the letter of resignation, together with the endorsements, to Major General Patton, the Commanding General of the 2nd Armored Division at Fort Hood, Texas. General Webb requested that General Patton hold the resignation until after Captain Cole's return to Fort Hood from Germany in September 1976.

32. On September 14, 1976, Captain Cole submitted to the Inspector General of the U.S. Army in Europe 45 allegations dealing with (1) the alleged harassment and intimidation of Captain Cole in Germany, and (2) alleged espionage and black marketeering in the 3rd Brigade of the 2nd Armored Division.

33. Between July 1976 and March 1977, Captain Cole wrote a number of communications to Members of Congress and to the Inspector General of the Army, in which Captain Cole reported instances of what he regarded as logistical and financial mismanagement, and lack of combat readiness, in the Army in Europe. These communications prompted Members of Congress to write letters of inquiry to the Department of Defense, and they prompted the Inspector General to conduct investigations.

34. Captain Cole returned to Fort Hood, Texas, from Germany on September 15, 1976. Upon returning to Fort Hood, Captain Cole was assigned to serve as Assistant S-3, 1st Brigade, 2d Armored Division. The S-3 was the Operations Officer for the brigade.

35. On September 20, 1976, Captain Cole met with Major General George S. Patton, Jr., the Commander of the 2nd Armored Division; and they discussed Captain Cole's letter of resignation. General Patton said that he intended to consider the resignation and to discuss it with his staff. Captain Cole told General Patton that he wanted to withdraw the resignation.

36. On September 21, 1976, Captain Cole sent a letter to General Patton, requesting in the following language that he be permitted to withdraw his resignation:

I request that my unqualified resignation dated 15 June 1976 be withdrawn and all copies of this resignation be returned to me. If the resignation will not be returned to me, I request that the resignation with the initial withdrawal request dated 27 July 1976 be forwarded immediately to the Department of the Army for action.

If I do not receive a written response to this request by 23 September 1976, I will take appropriate action.

37. On September 29, 1976, General Patton endorsed Captain Cole's letter of resignation, recommending disapproval of the request to withdraw the resignation and acceptance of the resignation. In taking this action, General Patton concurred with the comments of General Webb in the latter's endorsement. In deciding to recommend the acceptance of Captain Cole's resignation and the rejection of Captain Cole's request to withdraw the letter of resignation, General Patton was heavily in-

fluenced by the language used by Captain Cole in his letter of resignation.

38. General Patton forwarded Captain Cole's resignation, with the accompanying endorsements, to Headquarters, Department of the Army. There, the papers were referred to the Officer Personnel Management Directorate in the Military Personnel Center. There existed in the Officer Personnel Management Directorate a Special Review Board, which had the responsibility of reviewing all cases (1) that required a waiver of a service obligation, (2) that required a waiver of a school obligation, or (3) that involved a situation where an officer had requested a personnel action and the chain of command had recommended disapproval of the request. Captain Cole's case was referred to the Special Review Board because (1) Captain Cole had sought to withdraw his unqualified resignation and the chain of command had disapproved the request, and (2) Captain Cole still had several months of service obligation by reason of schooling. Captain Cole's case was discussed by the Special Review Board, and then the matter was put to a vote. The members of the Special Review Board voted unanimously to approve the acceptance of Captain Cole's resignation and to disapprove Captain Cole's request to withdraw his resignation.

39. (a) In October of 1976, Lt. Col. Jack Cole (U.S. Army, Ret.), Captain Cole's father, wrote to General Bernard W. Rogers, Army Chief of Staff, concerning Captain Cole's case.

(b) After receiving Lt. Col. Cole's letter, General Rogers directed that the process of separating Captain Cole from the Army be suspended. Accordingly, on October 22, 1976, the Military Personnel Center suspended further proceedings looking toward the separation of Captain Cole from the Army.

40. (a) Subsequently, in November of 1976, General Rogers discussed Captain Cole's case with Lt. Gen. Marvin Fuller, the Inspector General of the Army. General Rogers stated that he was concerned that there could be a mistake and that he wanted to make sure that the Army was not wasting a resource in Captain Cole. General Rogers asked General Fuller to inquire into the matter for the purpose of ensuring that no mistake was being made.

(b) After the meeting with General Rogers, General Fuller directed the Military Personnel Center to hold Captain Cole's resignation while he inquired into the matters surrounding it.

(c) Lt. General Fuller conducted his inquiry during the months of November and December, 1976, and into January of 1977. General Fuller's objective was to ensure that the processing of the resignation was being done properly, and to determine whether it should be allowed to proceed. On the basis of his investigation, General Fuller concluded that Captain Cole was a brilliant individual, but one who would not accept defects and who harshly condemned anyone else making a mistake; and that it would be a waste of the taxpayers' money to keep Captain Cole in the Army, because Captain Cole's view of the world was so maladjusted that the only way to make him a contributor would be through extensive counseling. General Fuller advised General Rogers that, in his view, Captain Cole would never be of any real worth to the Army, and that there was nothing to be gained by delaying the processing of Captain Cole's resignation.

(d) Based upon General Fuller's evaluation, General Rogers decided to accept Captain Cole's resignation, to deny Captain Cole's request to withdraw the resignation, and to end the suspension of the separation process at the Military Personnel Center.

(e) After his meeting with General Rogers, General Fuller directed the Military Personnel Center to proceed with the separation of Captain Cole.

41. A request by Captain Cole for an extension of his release date was denied; and on March 10, 1977, Captain Cole was separated from the Army.

42. On August 14, 1978, Captain Cole applied to the Army Board for the Correction of Military Records, asking (among

other things) that his resignation be voided and he be reinstated in the Army with back pay and benefits. The Board denied Captain Cole's application.